Randall T. Garteiser (CBN 231821)
rgarteiser@ghiplaw.com
Christopher A. Honea (CBN 232473)
chonea@ghiplaw.com
GARTEISER HONEA, P.C.
119 W. Ferguson St.
Tyler, Texas 75702
Tel: (888) 908-4400

Attorneys for Plaintiff
APERTURE NET LLC

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APERTURE NET LLC,<br><br>　　　　Plaintiff,<br><br>v.<br><br>FRANKLIN WIRELESS CORP.,<br><br>　　　　Defendant. | Civil Case No.: **'22CV1885 TWR AHG**<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Aperture Net LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Franklin Wireless Corp. ("Franklin" or "Defendant"), and alleges, upon information and belief, as follows:

## THE PARTIES

1. Aperture Net LLC is a limited liability company organized and existing under the laws of the State of California with its principal place of business at 6009 W. Parker Road, Suite 149-1036, Plano, TX 75093.

2. Defendant is a corporation organized and existing under the laws of the State of Nevada with a place of business in this District located at 9707 Waples St. Suite 150, San Diego, CA 92121. Defendant may be served through its registered agent, OKCHAE KIM, located at 9707 Waples St. Suite 150, San Diego, CA 92121.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.

4. This Court has personal jurisdiction over Defendant. Defendant has continuous and systematic business contacts with the State of California. Defendant transacts business within this District and elsewhere in the State of California. Further, this Court has personal jurisdiction over Defendant based on its commission of one or more acts of infringement of Aperture's Patents in this District and elsewhere in the State of California.

5. Defendant directly conducts business extensively throughout the State of California, by distributing, making, using, offering for sale, selling, and advertising its products and services in the State of California and in this District. Defendant has purposefully and voluntarily made its business services, including the infringing systems and services, available to residents of this District and into the stream of commerce with the intention and expectation that they will be purchased and/or used by consumers in this District.

6. Defendant maintains physical brick-and-mortar business locations in the State of California and within this District, retains employees specifically in this District for the

purpose of servicing customers in this District, and generates substantial revenues from its business activities in this District.

7. Venue is proper in this District as to Defendant pursuant to at least 28 U.S.C. §§ 1391(c)(2) and 1400(b). As noted above, Defendant maintains a regular and established business presence in this District.

**PATENTS-IN-SUIT**

8. Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patent 6,711,204 (the "'204 Patent"), titled "Channel Sounding for a Spread-Spectrum Signal" (hereinafter collectively referred to as "the Patents-In-Suit").

9. By written instruments duly filed with the United States Patent and Trademark Office, Aperture is assigned all rights, title, and interest in the Patents-In-Suit. As such, Plaintiff has sole and exclusive standing to assert the Patents-In-Suit and to bring these causes of action.

10. The Patents-In-Suit are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

11. Donald L. Schilling is the sole named inventor for the Patents-In-Suit, who has co-authored 12 textbooks, more than 200 technical papers, and has more than 125 patents in telecommunications and electronics.

12. The Patents-In-Suit have been cited in 12 patents issued to well-known industry leaders, including AT&T, IBM, Rambus and Ericsson.

13. The Patents-In-Suit each include numerous claims defining distinct inventions. No single claim is representative of any other.

14. The priority date of each of the Patents-In-Suit is at least as early as January 4, 1999. As of the priority date, the inventions as claimed were novel, non-obvious, unconventional,

and non-routine. Indeed, the Patents-In-Suit overcame a number of specific technological problems in the industry, and provided specific technological solutions.

15. The claims of the Patents-In-Suit are patent eligible under 35 U.S.C. § 101, 102, 103, and 112, as reflected by the fact that three different Patent Examiners all agreed and allowed the Patents-In-Suit over extensive prior art as disclosed and of record during the prosecution of the Patents-In-Suit. *See Stone Basket Innov. v. Cook Medical,* 892 F.3d 1175, 1179 (Fed. Cir. 2018) ("when prior art is listed on the face of a patent, the examiner is presumed to have considered it") (citing *Shire LLC v. Amneal Pharm., LLC,* 802 F.3d 1301, 1307 (Fed. Cir. 2015)); *Exmark Mfg. v. Briggs & Stratton,* 879 F.3d 1332, 1342 (Fed. Cir. 2018).

16. After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiners allowed all of the claims of the Patents-In-Suit to issue. In so doing, it is presumed that Examiners used their knowledge of the art when examining the claims. *See K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014). It is further presumed that Patent Examiners had experience in the field of the invention, and that the Patent Examiners properly acted in accordance with a person of ordinary skill. *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

17. The claims of the Patents-In-Suit are novel and non-obvious, including over all non-cited art that is merely cumulative with the referenced and cited prior art. *See* 37 C.F.R. § 1.56(b) (information is material to patentability when it is not cumulative to information already of record in the application); *see also AbbVie Deutschland GmbH v. Janssen Biotech,* 759 F.3d 1285, 1304 (Fed. Cir. 2014); *In re DBC,* 545 F.3d 1373, 1382 (Fed. Cir. 2008). Likewise, the claims of the Patents-In-Suit are novel and non-obvious, including

over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by the Examiners. *See, e.g., St. Clair I.P. Consultants v. Canon, Inc.,* 2011 WL 66166 at *6 (Fed. Cir. 2011); *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002); *In re Koninklijke Philips Patent Litigation,* 2020 WL 7392868 at *19 (N.D. Cal. 2020); *Standard Oil v. American Cyanamid,* 774 F.2d 448, 454 (Fed. Cir. 1985) (persons of ordinary skill are presumed to be aware of all pertinent prior art).

## THE ACCUSED INSTRUMENTALITIES

18. Upon information and belief, Defendant makes, sells, advertises, offers for sale, uses, or otherwise connects to a Wi-Fi access point (base station (BS)) using Wi-Fi technology covered by the Patents-In-Suit, including the Franklin Wireless R910 Mobile Hotspot, as represented below, including all augmentations to these platforms or descriptions of platforms. Collectively, all the foregoing is referred to herein as the "Accused instrumentalities."



*See* https://www.franklinwireless.com/r910.

19.     The accused product (remote station (RS)) connects to a Wi-Fi access point (base station (BS)) using Wi-Fi technology. The Wi-Fi and/or Wi-Fi IEEE 802.11 standard uses b/g/n 2.4GHz and ac/a/n 5GHz ISM bands. The accused product supports both the bands. The IEEE 802.11b standard uses DSSS (Direct Sequence Spread Spectrum). An access point connected to the accused product transmits a plurality of BS-spread-spectrum signals at a first frequency defined by the 2.4GHz ISM band and/or the 5GHz band.

20.     The frequency used for the communication between the BS and the plurality of RS is defined by the IEEE 802.011 standard. When a hotspot is created, it acts as an access point (AP) and sends out beacon frames. The devices within the range receive the frames and use the frames to connect to the AP as per the connection parameters described in the frames. A Probe Response frame carries all the parameters in a beacon frame, which enables mobile stations to match parameters and join the network. These fields specify the channel frequency to be used and the spacing of the channel. Once the frequency

measurement is complete, both the uplink and downlink communication takes place on the measured frequency.

21. As shown below, the accused product supports Wi-Fi and acts as 802.11a/b/g/n wireless access point.

> **Wi-Fi (WLAN) Information**
>
> - **Advanced Settings**: Change your devices Wi-Fi (WLAN) settings as required. See Wi-Fi Advanced Settings
> - **Simultaneous Connection**: Use your device to connect up to 10 Wi-Fi devices simultaneously.
> - **Automatic Updates for Optimizing Wi-Fi Connection**: When connected by Wi-Fi, connection optimizing settings may be automatically received and updated.
> - Your device supports IEEE 802.11 b/g/n standards. Connect Wi-Fi devices (PC, game console, etc.) via Wi-Fi for wireless data transfers.

See https://www.franklinwireless.com/_files/ugd/edc413_79e90eeaff9943c682bb8fba24bb1e5e.pdf.

> ▪ **802.11 Mode**: Use this setting to change the Wi-Fi mode. R910 Supports 802.11b, 802.11g, and 802.11n modes in the 2.4GHz band and supports two mixed modes. 5GHz band supports 802.11n mode and 802.11ac mode respectively.

See https://www.franklinwireless.com/_files/ugd/edc413_79e90eeaff9943c682bb8fba24bb1e5e.pdf

> 802.11b and 802.11g use the 2.4 GHz ISM band, operating in the United States under Part 15 of the U.S. Federal Communications Commission Rules and Regulations; 802.11n can also use that band. Because of this choice of frequency band, 802.11b/g/n equipment may occasionally suffer interference in the 2.4 GHz band from microwave ovens, cordless telephones, and Bluetooth devices etc. 802.11b and 802.11g control their interference and susceptibility to interference by using direct-sequence spread spectrum (DSSS) and orthogonal frequency-division multiplexing (OFDM) signaling methods, respectively.

See https://en.wikipedia.org/wiki/IEEE_802.11.

> Wi-Fi IEEE 802.11 is used by very many devices from smartphones to laptops and tablets to remote sensors, actuators televisions and many more.
>
> There are several frequency bands within the radio spectrum that are used for the Wi-Fi and within these there are many channels that have been designated with numbers so they can be identified.
>
> Although many Wi-Fi channels are selected automatically, it sometimes helps to have an understanding of the Wi-Fi spectrum, bands, frequencies and the channels with their channel numbers to enable the best performance to be gained.
>
> When setting up a Wi-Fi network at home, in the office, or anywhere else, it can help to have a knowledge of the channels and bands available, so that successful Wi-Fi links can be established
>
> Also when office Wi-Fi access points are installed, it helps to understand the bands, their characteristics and the channels available.

*See* https://www.electronics-notes.com/articles/connectivity/wifi-ieee-802-11/channels-frequencies-bands-bandwidth.php.

> Wi-Fi is aimed at use within unlicensed spectrum - the ISM or Industrial, Scientific and Medical bands. These bands have been internationally agreed and unlike most other bands, they can be used without the need for a transmitting licence. This gives access to everyone to use them freely.
>
> The ISM bands are not only used by Wi-Fi, but everything from microwave ovens to many other forms of wireless connectivity and many industrial, scientific and medical uses.
>
> Whilst the ISM bands are available globally, there are some differences and restrictions that can occur in some countries.
>
> The main bands used for carrying Wi-Fi are those in the table below:
>
> **SUMMARY OF MAJOR ISM BANDS**
>
> | LOWER FREQUENCY MHZ | UPPER FREQUENCY MHZ | COMMENTS |
> |---|---|---|
> | 2400 | 2500 | Often referred to as the 2.4 GHz band, this spectrum is the most widely used of the bands available for Wi-Fi. Used by 802.11b, g, & n. It can carry a maximum of three non-overlapping channels. This band is widely used by many other non-licensed items including microwave ovens, Bluetooth, etc. |
> | 5725 | 5875 | This 5 GHz Wi-Fi band or to be more precise the 5.8 GHz band provides additional bandwidth, and being at a higher frequency, equipment costs are slightly higher, although usage, and hence interference is less. It can be used by 802.11a & n. It can carry up to 23 non-overlapping channels, but gives a shorter range than 2.4 GHz. 5GHz Wi-Fi is preferred by many because of the number of channels and the bandwidth available. There are also fewer other users of this band. |

*See* https://www.electronics-notes.com/articles/connectivity/wifi-ieee-802-11/channels-frequencies-bands-bandwidth.php.

### 2.4 GHz Wi-Fi channel frequencies

The table given below provides the frequencies for the total of fourteen 802.11 Wi-Fi channels that are available around the globe. Not all of these channels are available for use in all countries.

**2.4GHZ BAND CHANNEL NUMBERS & FREQUENCIES**

| CHANNEL NUMBER | LOWER FREQUENCY MHZ | CENTER FREQUENCY MHZ | UPPER FREQUENCY MHZ |
|---|---|---|---|
| 1 | 2401 | 2412 | 2423 |
| 2 | 2406 | 2417 | 2428 |
| 3 | 2411 | 2422 | 2433 |
| 4 | 2416 | 2427 | 2438 |
| 5 | 2421 | 2432 | 2443 |
| 6 | 2426 | 2437 | 2448 |
| 7 | 2431 | 2442 | 2453 |
| 8 | 2436 | 2447 | 2458 |
| 9 | 2441 | 2452 | 2463 |
| 10 | 2446 | 2457 | 2468 |
| 11 | 2451 | 2462 | 2473 |
| 12 | 2456 | 2467 | 2478 |
| 13 | 2461 | 2472 | 2483 |
| 14 | 2473 | 2484 | 2495 |

*See* https://www.electronics-notes.com/articles/connectivity/wifi-ieee-802-11/channels-frequencies-bands-bandwidth.php.

### 2.4 GHz Wi-Fi channel availability

In view of the differences in spectrum allocations around the globe and different requirements for the regulatory authorities, not all the WLAN channels are available in every country. The table below provides a broad indication of the availability of the different Wi-Fi channels in different parts of the world.

**2.4 GHZ WI-FI CHANNEL AVAILABILITY**

| CHANNEL NUMBER | EUROPE (ETSI) | NORTH AMERICA (FCC) | JAPAN |
|---|---|---|---|
| 1 | ✓ | ✓ | ✓ |
| 2 | ✓ | ✓ | ✓ |
| 3 | ✓ | ✓ | ✓ |
| 4 | ✓ | ✓ | ✓ |
| 5 | ✓ | ✓ | ✓ |
| 6 | ✓ | ✓ | ✓ |
| 7 | ✓ | ✓ | ✓ |
| 8 | ✓ | ✓ | ✓ |
| 9 | ✓ | ✓ | ✓ |
| 10 | ✓ | ✓ | ✓ |
| 11 | ✓ | ✓ | ✓ |
| 12 | ✓ | No | ✓ |
| 13 | ✓ | No | ✓ |
| 14 | No | No | 802.11b only |

*See* https://www.electronics-notes.com/articles/connectivity/wifi-ieee-802-11/channels-frequencies-bands-bandwidth.php.

| CHANNEL NUMBER | FREQUENCY MHZ | EUROPE (ETSI) | NORTH AMERICA (FCC) | JAPAN |
|---|---|---|---|---|
| 36 | 5180 | Indoors | ✓ | ✓ |
| 40 | 5200 | Indoors | ✓ | ✓ |
| 44 | 5220 | Indoors | ✓ | ✓ |
| 48 | 5240 | Indoors | ✓ | ✓ |
| 52 | 5260 | Indoors / DFS / TPC | DFS | DFS / TPC |
| 56 | 5280 | Indoors / DFS / TPC | DFS | DFS / TPC |
| 60 | 5300 | Indoors / DFS / TPC | DFS | DFS / TPC |
| 64 | 5320 | Indoors / DFS / TPC | DFS | DFS / TPC |
| 100 | 5500 | DFS / TPC | DFS | DFS / TPC |
| 104 | 5520 | DFS / TPC | DFS | DFS / TPC |
| 108 | 5540 | DFS / TPC | DFS | DFS / TPC |
| 112 | 5560 | DFS / TPC | DFS | DFS / TPC |
| 116 | 5580 | DFS / TPC | DFS | DFS / TPC |
| 120 | 5600 | DFS / TPC | No Access | DFS / TPC |
| 124 | 5620 | DFS / TPC | No Access | DFS / TPC |
| 128 | 5640 | DFS / TPC | No Access | DFS / TPC |
| 132 | 5660 | DFS / TPC | DFS | DFS / TPC |
| 136 | 5680 | DFS / TPC | DFS | DFS / TPC |
| 140 | 5700 | DFS / TPC | DFS | DFS / TPC |
| 149 | 5745 | SRD | ✓ | No Access |
| 153 | 5765 | SRD | ✓ | No Access |
| 157 | 5785 | SRD | ✓ | No Access |
| 161 | 5805 | SRD | ✓ | No Access |
| 165 | 5825 | SRD | ✓ | No Access |

*See* https://www.electronics-notes.com/articles/connectivity/wifi-ieee-802-11/channels-frequencies-bands-bandwidth.php.

## Connecting to the Network

The wireless host (station) needs to associate with an Access Point (AP) before it can send/receive network-layer data. This is a basic 802.11 system management function.

**Association** is the creation of a 'virtual' ethernet wire between the station and the switch.

The basic three-step procedure followed by the station:

1. **Locate** an AP to associate with; this process can involve passive or active scanning as discussed below.
2. **Authenticate** itself to the AP (and possibly the infrastructure).
3. **Associate** with the AP (create the 'virtual' blue cable).

Now, the station can retrieve an IP address from the subnet and begin TCP/UDP socket communications.

### Locate

The first step is to locate the AP you wish to join. The algorithm for locating/selecting an AP is not defined by the 802.11 standards, but by your application. There are two methods provided in 802.11 to discover APs near the station: **passive** and **active** scanning, which are illustrated below.



**Passive Scanning:**
(1) H1 scans for beacon frames sent from AP's within range on a specific channel

Process takes ~100's of ms

Beacon Frames contain
  AP's SSID, MAC Address (BSSID)

**Active Scanning:**
(1) Probe request frame broadcast from H1 to all APs (specific SSID)
(2) Probe response frame sent from specific AP

Process takes ~10's of ms

Probe Response frame contains
  AP's MAC Address (BSSID),
  supported data rates

Graphics Adapted from "Computer Networking A Top Down Approach 5th Ed." © 1996-2012 J.F Kurose and K.W. Ross, All Rights Reserved

*See* https://microchipdeveloper.com/wifi:connecting.



Figure 4-23. Beacon Interval field

See https://www.oreilly.com/library/view/80211-wireless-networks/0596100523/ch04.html#wireless802dot112-CHP-4-FIG-38.



Figure 4-51. Beacon frame

See https://www.oreilly.com/library/view/80211-wireless-networks/0596100523/ch04.html#wireless802dot112-CHP-4-FIG-38.

> **Probe Response**
>
> If a Probe Request encounters a network with compatible parameters, the network sends a Probe Response frame. The station that sent the last Beacon is responsible for responding to incoming probes. In infrastructure networks, this station is the access point. In an IBSS, responsibility for Beacon transmission is distributed. After a station transmits a Beacon, it assumes responsibility for sending Probe Response frames for the next Beacon interval. The format of the Probe Response frame is shown in Figure 4-53. Some of the fields in the frame are mutually exclusive; the same rules apply to Probe Response frames as to Beacon frames.

*See* https://www.oreilly.com/library/view/80211-wireless-networks/0596100523/ch04.html#wireless802dot112-CHP-4-FIG-38.

> **Country**
>
> The initial 802.11 specifications were designed around the existing regulatory constraints in place in the major industrialized countries. Rather than continue to revise the specification each time a new country was added, a new specification was added that provides a way for networks to describe regulatory constraints to new stations. The main pillar of this is the Country information element, shown in Figure 4-38.
>
> 
>
> *Figure 4-38. Country information element*
>
> After the initial type/length information element header, there is a country identifier, followed by a series of three-byte descriptors for regulatory constraints. Each constraint descriptor specifies a unique band, and they may not overlap, since a given frequency has only one maximum allowed power.

*See* https://www.oreilly.com/library/view/80211-wireless-networks/0596100523/ch04.html#wireless802dot112-CHP-4-FIG-38

## COUNT I
## Infringement of U.S. Patent No. 6,711,204

22. Plaintiff incorporates the above paragraphs by reference.

23. Defendant has been on actual notice of the '204 Patent at least as early as the date it received service of the Original Complaint in this litigation.

24. The damages period begins at least as early as six years prior to the date of service of the Original Complaint in this litigation.

25. Defendant manufactures, sells, offers for sale, owns, directs, and/or controls the operation of the Accused Instrumentalities and generates substantial financial revenues and benefits therefrom.

26. Defendant has directly infringed and continues to directly infringe the claims of the '204 Patent. As exemplary, Claim 1 is infringed by making, using, importing, selling, and/or offering for sale the Accused Instrumentalities. Defendant directly makes and sells the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing systems into service by directing or controlling the systems as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, with respect to the Accused Instrumentalities, Defendant:

- (i) transmits beacon frames (sounding signals) to the devices nearby at the second frequency (measured/calculated frequency used for the uplink communication). The Power Constraint element included in the beacon frames allows a device (trying to connect to the base station) to determine the local maximum transmit power in the current channel being used for communication and describes the maximum transmit power to remote stations. The local maximum transmit power for a channel is defined as the maximum transmit power level specified for the channel in the Country element minus the local power constraint specified for the channel in the Power Constraint element;

- (ii) the 802.11 standard is a half-duplex technology, hence a remote station can either receive or transmit at a given time, which implies that when a remote station receives the sounding signal at the second frequency it is not transmitting at the first frequency; and

- (iii) transmits beacon frames (sounding signal) to the devices nearby at the second frequency (measured/calculated frequency used for the uplink communication). The Power Constraint element included in the beacon frames allows a device (trying to connect to the base station) to determine the local maximum transmit

power in the current channel being used for communication and describes the maximum transmit power to remote stations. The local maximum transmit power for a channel is defined as the maximum transmit power level specified for the channel in the Country element minus the local power constraint specified for the channel in the Power Constraint element.

27. Further on information and belief, Defendant directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States, including via its Internet domain web pages and/or software applications, as well as via its internal systems and interfaces. Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. Such testing and/or legal compliance necessarily requires Defendant to make and use the Accused Instrumentalities in an infringing manner. Still further, Defendant is a direct infringer by virtue of its branding and marketing activities, which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

28. As shown above, Defendant is making, using, and offering for sale the Accused Instrumentalities.

29. Additionally, upon information and belief, Defendant owns, directs, and/or controls the infringing method operation of the Accused Instrumentalities.

30. On information and belief, the infringement of the Patents-In-Suit by Defendant will now be willful through the filing and service of this Complaint.

31. In addition or in the alternative, Defendant now has knowledge and continues these actions and it indirectly infringes by way of inducing direct infringement by others and/or

contributing to the infringement by others of the '204 Patent in the State of California, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, infringing services for use in systems that fall within the scope of the claims of the '204 Patent. This includes without limitation, one or more of the Accused Instrumentalities by making, using, importing offering for sale, and/or selling such services, Defendant injured Aperture and is thus liable to Aperture for infringement of the '204 Patent under 35 U.S.C. § 271.

32. Now with knowledge of the Patents-In-Suit, Defendant induces infringement under Title 35 U.S.C. § 271(b). Defendant will have performed actions that induced infringing acts that Defendant knew or should have known would induce actual infringements. *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990), quoted in *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed.Cir.2006) (*en banc* in relevant part). "[A] finding of inducement requires a threshold finding of direct infringement— either a finding of specific instances of direct infringement or a finding that the accused products necessarily infringe." *Ricoh,* 550 F.3d at 1341 (citing *ACCO Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307, 1313, (Fed. Cir. 2007).

33. Plaintiff will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence."); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

34. Defendant has taken active steps to induce infringement, such as advertising an infringing use, which supports a finding of an intention for the accused product to be used in an

15

infringing manner. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) (explaining that the contributory infringement doctrine "was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement").

35. In addition, on information and belief, and based in part upon the clear infringement by the Accused Instrumentalities, Defendant has a practice of not performing a review of the patent rights of others first for clearance or to assess infringement thereof prior to launching products and services. As such, Defendant has been willfully blind to the patent rights of Plaintiff.

36. The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff. The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Patents-In-Suit.

37. Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Aperture Systems, LLC respectfully requests the Court enter judgment against Defendant as follows:

1. Declaring that Defendant has infringed each of the Patents-In-Suit;

2. Awarding Plaintiff its damages suffered because of Defendant's infringement of the Patents-In-Suit;

3. Enter a judgment awarding treble damages pursuant to 35 U.S.C. §284 for Defendant's willful infringement of one or more of the Patents-In-Suit;

16

4.   Awarding Plaintiff its costs, reasonable attorneys' fees, expenses, and interest; and

5.   Granting Plaintiff such further relief as the Court finds appropriate.

**JURY DEMAND**

Plaintiff demands trial by jury, under Fed. R. Civ. P. 38.

                                          Respectfully Submitted

                                          */s/ Randall T, Garteiser*
                                          Randall Garteiser
                                              California Bar No. 231821
                                              rgarteiser@ghiplaw.com
                                          Christopher A. Honea
                                              California Bar No. 232473
                                              chonea@ghiplaw.com

                                         **GARTEISER HONEA, PLLC**
                                         119 W. Ferguson Street
                                         Tyler, Texas  75702
                                         Telephone: (903) 705-7420
                                         Facsimile: (903) 405-3999

                                         **ATTORNEYS FOR PLAINTIFF**
                                         **APERTURE NET LLC**